## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| The Lamson & Sessions Co. | ) | **CASE NO. 05-cv-2702** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| ATS Logistics Services, Inc. | ) | **Memorandum Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

### INTRODUCTION

Plaintiff The Lamson & Sessions Co. ("Lamson") has filed a Motion for Partial Summary Judgment.  (Doc. 21). This case arises out of Lamson's request to have Defendant ATS Logistics Services, Inc., d.b.a. Sureway Transportation Company ("Sureway") defend and indemnify Lamson for a lawsuit now pending in Missouri State court.  For the reasons that follow, Plaintiff's motion is GRANTED.

1

## BACKGROUND

Lamson and Sureway entered into a Motor Contract Carrier Transportation Agreement on October 22, 2001.  The Agreement was "between Lamson & Sessions Co., an Ohio corporation, (hereinafter 'SHIPPER'), and Sureway Transportation Co., (hereinafter 'CARRIER') . . . ." Among other things, the Agreement included the following indemnity provision:

> 11. **INDEMNITY**
> CARRIER shall defend, indemnify and hold SHIPPER harmless from and against any and all claims, liabilities, loss, cost or expense (including court costs and reasonable attorneys' fees) (collectively "Losses") including, but not limited to Losses for injury to or death of persons or damage to property arising out of the performance of this Agreement and for any claims, costs and expense, including but not limited to court costs and reasonable attorney's fees incurred by SHIPPER as a result of the CARRIER's breach of any of these terms of this Agreement and the services contemplated hereunder.

Agreement ¶ 11.

On August 11, 2003, Lamson had a load of polyethylene pipe that needed to be transported from its manufacturing facility in Mountain Grove, Missouri.  Sureway brokered CR Trucking to deliver the load.  Unfortunately, the truck was in an accident and the driver died. The driver's wife then filed suit against Lamson in Missouri State Court.  The Missouri Complaint alleges that Lamson improperly loaded the truck and seeks damages under negligence and negligence per se theories.  Lamson sought a defense and indemnity in the Missouri action but Sureway refused.

Lamson then sued Sureway in this court for breach of contract and declaratory relief, and now seeks partial summary judgment on its claims.

## STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate

2

when no genuine issues of material fact exist and the moving party is entitled to judgment as a

matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local*

*600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrates
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the

lawsuit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleadings, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe

the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of*

*Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557,

562 (6th Cir. 1985).  However, "[t]he nonmoving party must come forward with some significant

probative evidence to support its claim.  If the nonmoving party fails to make a sufficient

showing on an essential element, which it has the burden of proof, the moving party is entitled to

3

summary judgment." *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

### DISCUSSION

Lamson's Count I seeks declaratory relief that Sureway is required to defend Lamson in the Missouri action. Lamson's motion seeks judgment in its favor on this Count. Count II seeks a declaratory judgment of indemnification. Lamson's motion seeks a declaratory judgment that Sureway will be obliged to indemnify Lamson in the event it settles or is forced to a pay a judgment in the Missouri action. Count III is for breach of contract stemming from Sureway's refusal to defend and indemnify Lamson. Lamson seeks a judgment of liability on the defense obligation as well as a judgment that the proper measure of damages for Sureway's breach includes Lamson's reasonable attorneys' fees, expenses and costs in both the Missouri action and this action. Finally, Lamson also moves for summary judgment on Sureway's affirmative defenses 1, 2, 3, 6, 7, 8, 9, 10 ,11, 12, 13 and 14.

To prove a breach of contract claim, a plaintiff must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Powell v. Grant Med. Ctr.*, 771 N.E.2d 874, 881 (Ohio App. 2002) (quoting *Nilavar v. Osborn*, 738 N.E.2d 1271, 1281 (Ohio App. 2000)). Here, it is undisputed that the contract existed and that plaintiff has performed. The Court also agrees with Lamson that the Agreement unambiguously[1] requires the "CARRIER" to defend and indemnify Lamson in the Missouri suit.

---

[1]     The Agreement requires the "CARRIER [to] defend, indemnify and hold SHIPPER harmless from and against any and all claims, liabilities, loss, cost or expense (including court costs and reasonable attorneys' fees) (collectively "Losses") including, but not limited to Losses for injury to or death of persons or damage to

The Agreement further extends these obligations to lawsuits such as this action which are a result of the "CARRIER's" breach of its obligations under the indemnity clause.  Under the terms of the indemnity provision:

> CARRIER shall defend, indemnify and hold SHIPPER harmless from and against any and all claims, liabilities, loss, cost or expense (including court costs and reasonable attorneys' fees) (collectively "Losses") including . . . court costs and reasonable attorney's fees incurred by SHIPPER as a result of the CARRIER's breach of any of these terms of this Agreement and the services contemplated hereunder.

Agreement ¶ 11.  Thus, Lamson is entitled to the requested relief from the contractual "CARRIER."

Sureway argues in its Opposition that it was not the "CARRIER."  Sureway has submitted the affidavit of Tim Barrett, the person who signed the Agreement on Sureway's behalf, who states that when Sureway and Lamson discussed the Agreement it was understood that Sureway would merely act as a broker to locate motor carriers—i.e., the "CARRIERS" of the Agreement—to transport loads.  Accordingly, "[t]he indemnity provision at Paragraph 11 was intended to be a provision that would bind the actual motor carriers and not bind [Sureway] as a transportation broker."

Sureway's argument is belied by the unambiguous terms of the Agreement.[2]  The very

---

property arising out of the performance of this Agreement . . . ." Agreement ¶ 11.  Lamson's loading of the truck clearly arises out of the performance of the Agreement: "Shipper will load trailers, count the freight, and supply carrier with a bill of lading and affix a pro number when appropriate."  Agreement ¶ 7.

[2]  The Agreement also includes an integration clause: "This Agreement exclusively and completely states the rights and obligations of the parties hereto with respect to the subject matter hereof and supersedes all other agreements, oral or written, with

5

first sentence of the Agreement states that "Sureway Transportation Co." is the "CARRIER" and Barrett's name appears three times as the "CARRIER Authorized Representative" for "Sureway Transportation."  Indeed, the Agreement contemplates that the CARRIER might have others work on its behalf: "J&J Trucking and its direct associates, acting as agent for CARRIER, will be the sole point of contact between SHIPPER and CARRIER."[3]  Because the Agreement is unambiguous, its meaning is set as a matter of law and extrinsic evidence such as Barrett's affidavit cannot create a fact issue for a jury.[4]  *See State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004) (explaining that "[c]ourts resort to extrinsic evidence of parties' intent only where the language is unclear or ambiguous"); *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.").

Accordingly, absent a valid affirmative defense Lamson is entitled to an order requiring the following: 1) on Count I, a declaratory judgment that Sureway has a duty to defend Lamson

respect to such matter and, except as to the extent expressly provided herein, supersedes all tariffs heretofore or hereafter published or filed by CARRIER."

[3]     The driver whose accident resulted in the Missouri suit signed the bills of lading for the load at issue as "CARRIER'S AGENT."

[4]     In fact, prior to Lamson's motion Sureway had no difficulty understanding the meaning of "CARRIER."  Sureway (also known as ATS) previously quoted portions of the indemnity provision to the Court  by substituting "[ATS]" for "CARRIER."  In explaining its position that the indemnity provision did not apply to the Missouri lawsuit, ATS-Sureway stated that "ATS reasonably agreed to indemnify Lamson" and that "[t]he indemnification clause plainly indicates that ATS agreed to defend, indemnify and hold Lamson harmless" only in certain circumstances.

from and against the claims asserted against Lamson in the Missouri action; 2) on Count II, a declaratory judgment that Sureway will be obliged to indemnify Lamson in the event any payment is made by Lamson in the Missouri action in settlement or to satisfy a judgment; 3) on Count III, a judgment of liability against Sureway based on its breach of its duty to defend Lamson in the Missouri action; and 4) on Count III, a judgment that the proper measure of damages for Sureway's breach is the amount of all damage to Lamson flowing from the breach, including Lamson's reasonable attorneys' fees, expenses and costs in the Missouri action, and Lamson's reasonable attorneys' fees, expenses and costs in this action.

Lamson also moves for summary judgment on Sureway's affirmative defenses 1, 2, 3, 6, 7, 8, 9, 10 ,11, 12, 13 and 14.[5]  As the party with the burden to prove its own affirmative defenses, Sureway "must come forward with some significant probative evidence to support its claim" if it wishes to avoid summary judgment.  *Brumbalough*, 427 F.3d at 1001.  Even though Lamson moves on twelve affirmative defenses, Sureway places all of its eggs in the "public policy" basket—affirmative defense 12.  Sureway makes two public policy arguments: 1) Ohio[6] public policy favors liability for those who improperly load trucks that will travel at high rates of speed; and 2) Ohio public policy does not allow parties to seek indemnification for willful or wanton acts.

"[I]ndemnity is a matter of contract and thus, the parties can agree on the scope of their payment."  *J. Miller Express, Inc. v. Pentz*, 667 N.E.2d 1018, 1021 (Ohio App. 1995).

---

[5]  Lamson did not move on affirmative defense 4 (failure to mitigate damages) or 5 (damages are unreasonable).

[6]  The parties do not dispute that the enforceability of the indemnity provision is governed by Ohio law.

Accordingly, indemnity contracts between commercial entities are generally enforced.  *Glaspell v. Ohio Edison Co.*, 505 N.E.2d 264, 266-67 (Ohio 1987); *see also Stickovich v. City of Cleveland*, 757 N.E.2d 50, 59 (Ohio App. 2001) (noting the "general rule [that] indemnity agreements . . . are [not] against public policy").  Although public policy exceptions have been recognized in limited circumstances:

> In a free and democratic society, freedom of contract is the general rule; public policy limits are the exception.  The doctrine does not grant courts a roving commission to police the terms of agreements and must be cautiously applied lest the exception swallow the rule.  The Ohio Supreme Court has repeatedly admonished the courts against the loose application of public policy to invalidate agreements . . . .

*Stickovich*, 757 N.E.2d at 59.

Sureway is only able to point the Court to two instances where Ohio courts have recognized public policy exceptions to indemnity agreements.  First, Ohio courts do not allow indemnity for willful or wanton acts.  *Zivich v. Mentor Soccer Club, Inc.*, 696 N.E.2d 201, 207-08 (Ohio 1998); *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 390 (Ohio 1992); *Harsh v. Lorain County Speedway, Inc.*, 675 N.E.2d 885, 888 (Ohio App. 1996).  Defendant's contention that Plaintiff's acts are willful or wanton will be addressed *infra*.  Second, Ohio courts have found that a statutory provision may state a public policy that an indemnity clause not be enforced.  For example, Ohio Rev. Code § 2305.51 "voids construction contracts that attempt to indemnify an indemnitee against liability arising out of or proximately caused by its own negligence."  *Coulter v. The Dayton Power & Light Co.*, 731 N.E.2d 1172, 1175 (Ohio App. 1999).  However, statutory public policy exceptions are narrowly construed.  In short, it is not enough that legislation merely touches upon subject matter; rather, the statute at issue must specifically forbid the enforcement of an indemnity obligation between particular parties.  *See Stickovich*,

8

757 N.E.2d at 60 ("Rather than simply invoking the nebulous catch phrase of public policy as Commercial Union requests, it is our duty to carefully review and apply the statute as written by the General Assembly."); *Coulter*, 731 N.E.2d at 1176 (declining to apply R.C. § 2305.51 where the contract at issue did not involve the indemnitee hiring the indemnitor to perform construction work as required by the statute).

Here, there is no applicable statutory provision that forbids indemnity contracts between shippers and carriers. Moreover, the Court declines Sureway's invitation to announce a new non-statutory public policy exception. The Court of course agrees that Ohio has an interest in the safety of large commercial trucks on its highways. However, Sureway does not explain how refusing to enforce a carrier's bargained-for obligation to indemnify a shipper for its negligence in loading a trailer promotes this interest. By generally enforcing indemnity contracts for negligence, but not for willful or wanton conduct, Ohio courts have acknowledged that allowing indemnity for negligent acts does not significantly increase the frequency of those acts.[7] In addition, highway safety might actually be improved through the enforcement of such an obligation, since the carrier—i.e., the party whose trailer is loaded with a product and who must transport the product long distances—will have an added incentive to inspect the load or supervise loading.

Other public policies encourage the enforcement of this indemnity clause. First, public policy encourages the enforcement of parties' contracts. *See Lamont Bldg. Co. v. Court*, 70

---

[7]     A contracting party that frequently engages in negligent acts would presumably have to pay a premium to the indemnitor. In other words, an indemnitee has ample incentive to exercise care to avoid accidents.

9

N.E.2d 447, 448 (Ohio 1946) ("When judges come to apply the doctrine, they must take care not to infringe on the rights of the parties to make contracts which are not clearly opposed to some principle or policy of law."); *Stickovich*, 757 N.E.2d at 59.  Here, Lamson presumably paid Sureway in exchange for its indemnity obligation.  The parties might have had good reason to place this responsibility on a carrier such as Sureway, since trucking accidents involve many variables while the shipper is only involved in the loading.  Second, public policy seeks to fully compensate accident victims.  This is not a case where the victim has waived his right to sue a negligent party, but rather an instance where two commercial entities made a reasoned decision to allocate the financial burden of potential accidents.  Instead of cutting off payment for victims there are now two commercial pockets available to satisfy any eventual judgment or settlement. *See Jones Truck Lines v. Ryder Truck Lines, Inc.*, 507 F.2d 100, 102 (6th Cir. 1974) (explaining that "the indemnification agreement would appear to have the effect of strengthening the possibility of recovery by a third party in that it would provide another source or 'pocket' from which a recovery could be obtained").

Because Ohio law does not recognize a public policy exception for negligence-based indemnity in these circumstances, the final issue is whether Plaintiff was reckless in loading the trailer and thus not entitled to indemnity.  Although the Missouri claims are captioned as negligence and negligence per se, the plaintiff in the Missouri lawsuit repeatedly alleges that Lamson was reckless in its loading of the truck.  As was noted above, the parties agree that an indemnity clause does not apply to willful or wanton conduct. *Zivich*, 696 N.E.2d at 207-08; *Bowen*, 585 N.E.2d at 390; *Harsh*, 675 N.E.2d at 888.  The Ohio Supreme Court has defined willful or wanton conduct "by adopting the definition of recklessness found in the Restatement

10

of Torts 2d:"

> The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

*Harsh*, 675 N.E.2d at 888 (quoting 2 Restatement of the Law 2d, Torts (1965), at 86, Section 500).  Willful conduct has also been defined as "conduct involving an intent, purpose or design to injure."  *Zivich,* 696 N.E.2d at 207 (internal quotations omitted).  Wanton conduct has also been "defined as conduct where one fails to exercise any care whatsoever toward those to whom he owes a duty of care, and this failure occurs under circumstances in which there is a great probability that harm will result."  *Id*.

The issue here is whether there has been an adequate showing of recklessness to avoid summary judgment.  The Court notes at the outset that allegations of recklessness in the underlying complaint do not suffice; Sureway must come forward with some evidence of actual recklessness.  *See Zivich*, 696 N.E.2d at 208 (holding that a party could not invoke the willful and wanton exception without evidence of such conduct); *Swartzentruber v. Wee-K Corp.*, 690 N.E.2d 941, 944 (Ohio App. 1997) (acknowledging a litigant's obligation to produce "evidentiary materials, in defense of summary judgment below, to substantiate her claim of 'willful, wanton and malicious' misconduct").

The only evidence that Sureway has provided to the Court is selected excerpts of the deposition of Ron Boileau, the Lamson employee in charge of loading trucks.  He supervises Jim Stanley, who assists in loading trucks and assisted in loading the load at issue.  Neither Boileau nor Stanley have any formal training in loading and unloading trucks.  Rather, both have

received on-the-job training.

The truck at issue in the Missouri action arrived at Lamson a little before 5:00 pm, which is Boileau's quitting time.  As is typical with a load such as the load at issue, Boileau and Stanley first loaded four bundles on each side of the flat bed truck.  The truck driver, Robert Moerke, then secured each of the two rows of four bundles with three belly straps.  Once these lower rows were secure, Boileau and Stanley loaded three more bundles on the top of each row, for a total of seven bundles per row or side.  Moerke then started to secure the remaining bundles with another set of six straps.  By this point it was after 5:00 pm.  Boileau took a picture of the loaded flat bed while Moerke was still securing the top portion of the load.  Boileau and Stanley left the truck to complete paperwork and did not see Moerke finish securing the load or leave. According to Boileau, each of these steps was in line with Lamson's standard procedures.

Sureway focuses on five aspects of this fact pattern: 1) that Boileau and Stanley continued to work after 5:00 pm; 2) that the load was heavy and tall; 3) that Boileau and Stanley left while Moerke was securing the load; 4) that Boileau and Stanley have no formal training for their specific job duties; and 5) that the load in question had been stored outside.  In contrast to Sureway's showing, cases surviving summary judgment typically involve patently dangerous conduct or clearly established standards that are not followed.  For example, in *Harsh* the movant motor speedway "built an earthen mound at the east end of the track to protect the pit area, but then allowed spectators, including appellant, to *stand on that hill to view races.*" 675 N.E.2d at 889 (emphasis in original).  There was also evidence that the speedway was aware that it did not meet certain minimum safety requirements.  *Id*.  In those circumstances, the appellate court found that there was a jury question on whether there was willful or wanton conduct.  *Id*.

12

Here, however, none of the acts could possibly rise to the level of recklessness.  As for the fact that Boileau and Stanley worked past 5:00 pm, there is nothing in the record to indicate that this negatively impacted their job performance.  As for the actual loading, Steps 2 - 5 were all standard procedure at Lamson.  There is no evidence that Boileau knew or had reason to know "of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."  *Harsh*, 675 N.E.2d at 888.  Nor can Sureway prove an intent to injure or a failure to exercise any care whatsoever.  *Zivich,* 696 N.E.2d at 207.

Accordingly, the Court concludes that Lamson is also entitled to summary judgment on affirmative defenses 1, 2, 3, 6, 7, 8, 9, 10 ,11, 12, 13 and 14.

**CONCLUSION**

The Court concludes that Lamson is entitled to summary judgment on affirmative defenses 1, 2, 3, 6, 7, 8, 9, 10 ,11, 12, 13 and 14 and to judgment as follows:

 1) on Count I, a declaratory judgment that Sureway  has a duty to defend Lamson from and against the claims asserted against Lamson in the Missouri action;

2) on Count II, a declaratory judgment that Sureway would be obliged to indemnify Lamson in the event any payment is made by Lamson in the Missouri action in settlement or to satisfy a judgment;

3) on Count III, a judgment of liability against Sureway based on its breach of its duty to defend Lamson in the Missouri action; and

4) on Count III, a judgment that the proper measure of damages for Sureway's

13

breach is the amount of all damage to Lamson flowing from the breach, including

Lamson's reasonable attorneys' fees, expenses and costs in the Missouri action,

and Lamson's reasonable attorneys' fees, expenses and costs in this action.


IT IS SO ORDERED.



/s/ Patricia A. Gaughan
_____
PATRICIA A. GAUGHAN
United States District Judge

Dated:  10/26/06

14